**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| BRIGHT DATA LTD. | Case No. 2:21-cv-00225-JRG-RSP |
| *Plaintiff,* | FILED UNDER SEAL |
| v. | |
| NETNUT LTD. | **JURY TRIAL DEMANDED** |
| *Defendant.* | |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, Bright Data Ltd. ("Bright Data" or "Plaintiff") brings this action under the patent laws of the United States, Title 35 of the United States Code, and false advertising under Title 15 of the United States Code at section 1125(a), and makes the following amended allegations against NetNut Ltd ("NetNut"):

## THE PARTIES

1.      Plaintiff Bright Data is an Israeli company having a principal place of business at 3 Hamahshev St., Netanya 42507, ISRAEL.

2.      Upon information and belief, NetNut is an Israeli company located at HaArba'a St 30, Tel Aviv, Israel.

## JURISDICTION AND VENUE

3.      This is an action for patent infringement under the patent laws of the United States of America, 35 U.S.C. § 1, et seq, and false advertising under 15 U.S.C. § 1125(a), et seq.

4. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338, and/or 1367. NetNut has not contested subject matter jurisdiction of this Court, and accepted service of process in the First Action (*Luminati Networks Ltd. v. NetNut Ltd.*, No. 20-cv-188 (E.D. Tex)).

5. This Court has personal jurisdiction over NetNut because it, directly or through its subsidiaries, divisions, groups, or distributors, has sufficient minimum contacts with this forum as a result of business conducted within the State of Texas, and/or pursuant to Fed. R. Civ. P. 4(k)(2). On information and belief, NetNut transacts substantial business in the State of Texas, directly or through agents, including upon information and belief: (i) at least a portion of the infringement alleged herein, and (ii) regularly does or solicits business in Texas, engages in other persistent courses of conduct, maintains continuous and systematic contacts within this Judicial District, purposefully avails itself of the privilege of doing business in Texas, and/or derives substantial revenue from services provided in Texas. For example, Defendant advertises its proxy services, including through its website and the Google Chrome Store, which are directed toward a global audience including customers in the United States and Texas, and these advertisements, including those that are subject of the false advertising claim, tout Defendant's proxy services, including its rotating residential proxy services, as being located throughout the world, including the United States. Upon information and belief NetNut has customers for its proxy services located in Texas which implement at least a portion of the infringement herein. In addition, NetNut utilizes software, which is the subject of the infringement alleged herein, that is embedded in a number of software applications which are placed into the stream of commerce with the knowledge, understanding, and/or intention that they be downloaded and executed by devices located in the State of Texas, as well as this Judicial District. Upon information and belief, the software

effectively turns the devices on which it is installed into peer-to-peer ("P2P") residential proxy devices that operate as part of NetNut's "Rotating Residential Proxies" service under NetNut's control. The Accused Services ("Accused Services") comprise NetNut's "Rotating Residential Proxies" and any substantially similar service including services that utilize proxy IP addresses from client devices as well as NetNut's "Static ISP Proxies" and any substantially similar service including services that utilize proxy IP addresses. The Accused Services are offered, operated, and provided by NetNut. NetNut has previously been subject to jurisdiction in this Court by the same similar conduct in the First Action (*see* Para. 14, below).



## ISP Static Residential Proxies

Static Residential Proxies are active IP addresses assigned from worldwide ISPs, enabling users to keep using the same residential IPs for **as long as they need**.

Static residential proxies are super-fast and highly reliable, offering 100% anonymity and 24/7 IP availability.

This enables NetNut's users to utilize the ISP proxy network for various use cases, from social media management to complex enterprise requirements.

https://netnut.io/static-residential-proxies/

# **Rotating Residential IP** Features

 **Rotating Proxies**

NetNut rotates proxies per each browser session by default and can be seamlessly integrated into any browser.

 **Fastest in the Market**

Gather data and scale faster using a dynamic P2P proxy network with 24/7 IP availability and virtually 0% fail rates.

 **Gather any Data**

Whether your use case is SEO, Social, ad verification, price comparison or brand protection, NetNut can handle any target.

https://netnut.io/rotating-residential-proxies/

## Worldwide **proxy coverage**

**NetNut's 20M+ Residential IPs** are sourced from real end-user devices from across the globe, allowing you to **access any web page** from any country in the world.

**Access millions of IPs** and utilize a dynamic Residential Proxy Network, combining **ISP and P2P proxy IP networks**.

This unique infrastructure eliminates any downtime, offering **high scalability** and guarantees maximum anonymity.

https://netnut.io/rotating-residential-proxies/

NetNut is the **fastest** residential proxy provider, offering **real and active** residential IPs for all web scraping and web data extraction activities.

By utilizing a dynamic P2P network and delivering optimized IP pools, NetNut is the ultimate solution for scraping and collecting web data at higher speed and at lower $/GB rates.

https://netnut.io/proxy-use-cases/proxies-for-web-data-extraction/?link=https%3A%2F%2Fnetnut.io%2Frotating-residential-proxies%2F

    6.      Upon information and belief, residential proxy devices with the embedded software are located throughout the United States, including Texas. NetNut touts the use of millions of rotating residential proxy devices including in the United States. NetNut also touts the ability to

select IP addresses by location based on city and state in the United States. Upon information and belief, this includes cities in Texas.

## Worldwide **proxy coverage**

**NetNut's 20M+ Residential IPs** are sourced from real end-user devices from across the globe, allowing you to **access any web page** from any country in the world.

**Access millions of IPs** and utilize a dynamic Residential Proxy Network, combining **ISP and P2P proxy IP networks**.

This unique infrastructure eliminates any downtime, offering **high scalability** and guarantees maximum anonymity.

Exhibit C, https://netnut.io/rotating-residential-proxies/

## How can I select an IP per country?

The country codes have the standard ISO coding. To select a specific country please change the proxy connection string for example:
IP:PORT:USERNAME-(proxy-type=dc/res/stc)-**COUNTRY**:PASSWORD.
More information on our available countries can be found under the "Available Countries" tab on the left-side toolbar in your user dashboard

https://netnut.io/faq/#faq

## Can I select an IP per city?

Yes, NetNut offers US city & state proxy selection.

https://netnut.io/faq/#faq

7.     Upon information and belief, NetNut is subject to this Court's jurisdiction because it committed patent infringement in the State of Texas and this jurisdiction. This Court has general jurisdiction over NetNut due to its continuous and systematic contacts with the State of Texas and this jurisdiction.

8.     Following *Brunette Machine Works v. Kockum Industries, Inc.*, 406 U.S. 706 1972), venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b) at least because, upon information and belief, NetNut is a foreign entity.

## FACTUAL ALLEGATIONS

9.     Derry Shribman and Ofer Vilenski are the sole inventors of a number of patents, including U.S. Patent No. 10,257,319 (Exhibit A, "'319 Patent") issued on November 5, 2019, U.S. Patent No. 10,484,510 (Exhibit B, "'510 Patent"), U.S. Patent Nos. 10,491,713 (Exhibit C, "'713 Patent") issued on November 26, 2019, U.S. Patent No. U.S. 11,050,852 (Exhibit D, "'852 Patent") issued on June 29, 2021, and U.S. Patent No. 11,044,346 (Exhibit E, "'346 Patent") issued on June 22, 2021 (collectively the "Asserted Patents").

10.     The '319 Patent and '510 Patent are divisionals sharing the same specification and are both titled "System Providing Faster and More Efficient Data Communication." The '713 Patent the '852 Patent and '346 Patent are continuations sharing the same specification and are all titled "System Providing Faster and More Efficient Data Communication." Bright Data identifies its '319 and '510 patents including on its website at https://Bright Data.io/patent-marking. Bright Data is the assignee and sole owner of the Asserted Patents.

11.     Bright Data, formerly known as Luminati Networks Ltd. ("Luminati") and Hola Networks Ltd. ("Hola"), provides a cloud service connecting tens of millions of devices over the Internet through a proxy-based network. Each participating device allows the service to utilize a

fraction of that device's idle time for the network. Bright Data utilizes this network to provide proxy-based services to its customers.

12. Since 2014, Bright Data has offered proxy-based services relying on its "Residential Proxy Network" that practice one or more claims of the Asserted Patents. Bright Data permits its business customers to utilize its residential proxy network to gather data over the Internet using residential proxy devices from various localities as required by the customers. Because each of these residential proxy devices has its own residential IP address, web servers receiving requests from these proxy devices do not recognize such requests as originating from the actual user making the request. Instead, the server identifies the request as coming from a residential device based upon the residential IP address of the proxy device. These residential proxy devices provide businesses with a number of advantages. For example, online retailers may anonymously use these residential proxy devices to gather information from web servers (such as for comparative pricing), businesses may utilize these devices to test their web sites from any city in the world, and cyber security firms may employ these devices to test web sites for malicious code. Following Bright Data's "Residential Proxy Network," Bright Data subsequently introduced related proxy services including its "ISP Proxies" and "Mobile Proxies," (collectively with the Residential Proxy Network referred to as "Bright Data Proxy Network") which also practice one or more claims of the Asserted Patents.

13. Prior to and separate from the technology at issue in this case, Hola provided a virtual private network ("VPN") service called HolaVPN.

14. On June 11, 2020, Bright Data filed the First Action against NetNut for infringement of U.S. Patent Nos. 10,484,511 and 10,637,968 (the "Related Patents"). *Luminati Networks Ltd. v. NetNut Ltd.*, No. 20-cv-188-JRG-RSP, Dkt. No. 1 (E.D. Tex. June 11, 2020).

NetNut has filed *ex parte* reexamination requests with the PTO regarding the patents from the First Action. *Id.*, at Dkt. Nos. 48, 57. Fact discovery closed in the First Action on June 14, 2021. *Id.*, at Dkt. No. 41.

15.     The Related Patents asserted in the First Action against NetNut share the same specification as the '319, '510, '713, '852 and '346 Patents asserted in this case. Upon information and belief, NetNut's officers, including its CEO Barak Avitbul, are keenly aware of the entire family of patents sharing the specification of the Related Patents, including the Asserted Patents. Upon information and belief, NetNut officers are also aware of Bright Data's patent marking webpage, on which the Asserted Patents are listed. Upon information and belief, NetNut is aware of other lawsuits that have been filed by Plaintiff alleging infringement of the asserted patents by peer-to-peer "Rotating Residential Proxy" services like the Accused Services. NetNut has had knowledge of the Asserted Patents and infringement since before the introduction of the Accused Services, and has willfully infringed the Asserted Patents. Upon information and belief, NetNut willfully concealed the development and release of its rotating residential proxy service in the United States in order to avoid enforcement of the Asserted Patents.

16.     Upon information and belief, "NetNut" is the brand name for Defendant's proxy business generally, including but not limited to the Accused Services. Upon information and belief, this includes a peer-to-peer residential proxy network with over twenty-million residential devices, each with its own IP address, and an ISP proxy network of approximately a million IP addresses.



https://netnut.io/

17.     NetNut touts their residential proxy service as including "US city and state proxy selection."  *See*  https://netnut.io/faq/#faq.  Upon information and belief, the rotating residential proxies have IP addresses that are "generated through real end-users devices."   Exhibit C, https://netnut.io/rotating-residential-proxies/?link=https%3A%2F%2Fnetnut.io%2F.                    Upon information and belief, this residential proxy network is used to access content over the Internet, wherein that content is identified by a content identifier.  Upon information and belief, NetNut's peer-to-peer residential proxy network supports Accused Services, as shown in the images above.  Upon information and belief, these residential proxies include residential proxy devices located in Texas.

**Rotating Residential Proxies**

✓ Unlimited concurrent connections
✓ Rotating and sticky session support
✓ Generated through real end-users devices

Exhibit C, https://netnut.io/rotating-residential-proxies/?link=https%3A%2F%2Fnetnut.io%2F.

18.     Upon information and belief, the NetNut rotating residential proxy network of the Accused Services is based upon numerous consumer devices or proxy client devices, such as laptops and cell phones, each of which is a client device identifiable over the Internet by an identifier, such as (but not limited to) an IP address.   Upon information and belief, these client devices become part of the network through the execution of software, such as by implementation of a software development kit ("SDK") that is embedded in software applications downloaded on the client devices.   Upon information and belief, these proxy client devices are available to receive requests submitted through the Accused Services and send the requests to a target web server, as well as sending any content received from the target web server to NetNut's requesting customer via an intermediary server of the Accused Services.

19.     Upon information and belief, NetNut provides instructions on how to use the Accused Services through different platforms as well as its own chrome extension application.

## Chrome Extension

Unlock the web using NetNut Chrome Extension without having to go through proxy integration. Easily target any country and choose static or rotating residential proxies right from your browser.

https://netnut.io/rotating-residential-proxies/

INTEGRATIONS

# How to Configure Proxy Settings on ParseHub

Easy integration guide to configure your ParseHub proxy settings with NetNut ...

READ MORE →

see e.g. https://netnut.io/integrations/?link=https%3A%2F%2Fnetnut.io%2F&link=https%3A%2F%2Fnetnut.io%2Frotating-residential-proxies%2F%3Flink%3Dhttps%253A%252F%252Fnetnut.io%252F

20.     Upon information and belief, NetNut controls client devices upon which NetNut's residential proxy network operates through SDK(s) installed on third-party client devices via NetNut's partner(s).

21.     NetNut provides a residential proxy service through the Accused Services allowing a NetNut customer to utilize peer-to-peer residential proxy devices in fetching content over the Internet.  Upon information and belief, SDKs supporting the Accused Services are installed on residential devices causing the devices to perform the steps of at least claims 1, 17, 24, 25 and 27 of the '319 Patent (U.S. Patent No. 10,257,319), and claims 1, 8, 13, 15, 16, 18, 20, 22, and 23 of the '510 Patent (U.S. Patent No. 10,484,510), at least claim 1, 11, 24 and 27 of the '713 Patent (U.S. Patent No. 10,491,713), and at least claim 1, 14, 25, and 28 of the '852 Patent (U.S. Patent No. 11,050,852).  This embedded code is under the control of NetNut, either directly or via NetNut's contractual relationship with its partners.  As this code is under the control of NetNut,

NetNut causes each of these steps to also be performed. In addition, given NetNut's contractual relationship with its customers, the customers utilization of the Accused Services also causes each of the claimed steps to be performed.

22. Specifically, upon information and belief, NetNut's rotating residential proxy network comprises numerous proxy devices, each of which is a client device such as a laptop or smartphone identifiable by its own identifier, such as (but not limited to) an IP address, with an SDK operating on that device. Upon information and belief, the proxy devices of the Accused Services send their identifiers to a server of the Accused Services, following the proxy client device connecting to the Internet, and the proxy client devices and server of the Accused Services communicate periodically thereafter.

23. Upon information and belief, the proxy client device is responsive to receiving a request from the server of the Accused Services. Upon information and belief, having received a request from a server of the Accused Services, the proxy client device is used to fetch content identified by a content identifier over the Internet from a web server, which stores the content. Upon information and belief, the proxy client device fetches content by (a) receiving a content identifier from the server of the Accused Services; (b) sending the content identifier to the web server; (c) receiving the content from the web server in response to the sending of the content identifier to the web server; and (d) sending the content to the server of the Accused Services. Upon information and belief, the above steps are executed including, for example, on the proxy client device by NetNut's software installed on that device, which can be downloaded on that proxy client device from servers on the Internet.

24. Upon information and belief, the content may include a part or whole files, text, numbers, audio, voice, multimedia, video, images, music, computer program, or a part or a whole

of a web-site page. Upon information and belief, the content may be identified by a uniform resource locator.

25. Upon information and belief, web servers are or include Hypertext Transfer Protocol (HTTP) servers that respond to HTTP requests including both normal HTTP and HTTPS requests, and the proxy device may send an HTTP request comprising the content identifier to the web server. Further, upon information and belief, the proxy device may establish Transmission Control Protocol (TCP) connections with the server of the Accused Services and web server, with the content identifier and content sent over the established TCP connections to and from the proxy device. Similarly, upon information and belief, the proxy device may establish a TCP connection with the web server.

26. Upon information and belief, each proxy device stores, operates, or uses a client operating system including but not limited to a mobile operating system such as Android version 2.2, 2.3, 4.0, 4.2, 4.4, and Microsoft Windows Phone version 7, 8, and 9.

27. The use of the residential proxy network permits anonymity to NetNut customers, such as for engaging in activities like as web crawling, without disclosing its identity to the targeted web sites.

28. Upon information and belief, Defendant's ISP Proxy Service is a web data extraction product and service under the NetNut brand. https://netnut.io/static-residential-proxies. Defendant touts their ISP Proxy Service as offering "premium static IPs" through "one-hop ISP connectively with no dependency on an end user's device." *Id*. Defendant further touts that all its "servers are located on major internet routes or at ISP network connectivity points that are completely controlled by NetNut." *Id*. Defendant further touts that its Proxy Service customers can select IP addresses located in the United States as well as specific cities in the United States.

https://netnut.io/faq.  Upon information and belief, the Proxy Service is used to access content such as webpages, audio and video content over the Internet, wherein that content is stored on a webserver and identified by a Uniform Resource Locator (URL).  Upon information and belief, NetNut's ISP proxy network, comprises NetNut proxy servers and DiVi Redirectors, which serve as intermediaries between NetNut's proxy servers and the target web servers of a NetNut customer's requests.



## Stability

All traffic is routed exclusively through the NetNut network; no third party computers are utilized. As a result, there won't be any disconnections or interruptions in the proxy network.

https://netnut.io/static-residential-proxies



## Quality

NetNut guarantees the quality of its service, as all the servers are located on major internet routes or at ISP network connectivity points that are completely controlled by NetNut.

https://netnut.io/static-residential-proxies

**How can I select an IP per country?**

The country codes have the standard ISO coding. To select a specific country please change the proxy connection string for example:

IP:PORT:USERNAME-(proxy-type=dc/res/stc)-**COUNTRY**:PASSWORD.

More information on our available countries can be found under the "Available Countries" tab on the left-side toolbar in your user dashboard

https://netnut.io/faq

**Can I select an IP per city?**

Yes, NetNut offers US city & state proxy selection.

https://netnut.io/faq



https://www.sec.gov/Archives/edgar/data/1725332/000121390020008198/f20f2019_safetgroup.htm

29.     In addition to their Rotating Residential Proxy Service, Defendant also provides an ISP proxy service through the Accused Services allowing a NetNut customer to utilize the Accused

15

Services in fetching content over the Internet. Upon information and belief, software installed on customers' devices, including but not limited to Defendant's software including NetNut's Chrome extension and other software including software configured as instructed by NetNut on its integrations webpage at https://netnut.io/integrations/, causes these devices to perform the steps of at least claims 1 of the '346 Patent (U.S. Patent No. 11,044,346). This code is under the control of Defendant, either directly or via Defendant's contractual relationship with its customers. As this code is under the control of Defendant, Defendant causes each of these steps to also be performed. In addition, given Defendant's contractual relationship with its customers, the customers utilization of the Accused Services also causes each of the claimed steps to be performed. Upon information and belief, client devices, including those controlled by Defendant's customers, can use the Accused Services to fetch content over the Internet by sending a query to a server of the Accused Services. As discussed above, upon information and belief, this query can comprise a URL corresponding with a webpage, audio and/or video content stored on a web server.



## Chrome Extension

Unlock the web using NetNut Chrome Extension without having to go through proxy integration. Easily target any country and choose static or rotating residential proxies right from your browser.



https://netnut.io/

30.     Specifically, upon information and belief, as shown above, a NetNut customer client device can fetch content from a web server using the NetNut Rotating Residential or ISP Proxy service.  This content can comprise multiple web-pages or portions of web-pages, each of which has its own distinct URL.  Upon information and belief, the NetNut proxy servers shown for example in the below diagram are configured to anonymously fetch a plurality of content identified by different URLs from web servers using a plurality of DiVi Redirectors and or residential proxy client devices, all of which are intermediate devices.  Upon information and belief, each NetNut proxy service customer can execute an application such as NetNut's Chrome extension or other application, including those configured consistent with the instructions provided by NetNut on its integrations webpage.  That application identifies the multiple URLs or parts of content and sends those URLs to the NetNut proxy server over the Internet as part of HTTP or HTTPS requests, which are standard Internet protocols associated with the world wide web.  In addition, upon information and belief, as shown above, the requesting client device can identify a geographic location, such as country, state or city and include that geographic location with the HTTP or HTTPS requests.  In response to sending these requests, the NetNut Proxy customer receives the requested content from the NetNut server.



https://www.sec.gov/Archives/edgar/data/1725332/000121390020008198/f20f2019_safetgroup.htm

## COUNT I
### (Infringement of US. Patent Nos. 10,257,319 - the '319 Patent)

31.     Bright Data repeats and re-alleges the allegations contained in paragraphs 1–30 of this First Amended Complaint as if fully set forth herein.

32.     The '319 Patent entitled "System Providing Faster and More Efficient  Data Communication" was duly and legally issued by the U.S. Patent and Trademark Office on April 9, 2019, from Application No. 15/957,945 filed on April 20, 2018, which is a continuation of application No. 14/025,109, which is a division of application No. 12/836,059, now Pat. No. 8,560,604, all of which claim priority to provisional application 61/249,624 filed on October 8, 2009.  A true and accurate copy of the '319 Patent is attached hereto as Exhibit A.

33.     Each and every claim of the '319 Patent is valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282.

18

34.     Bright Data is the sole owner of the '319 Patent and has rights to past damages.

35.     Claim 1 of the '319 Patent recites:

A method for use with a first client device, for use with a first server that comprises a web server that is a Hypertext Transfer Protocol (HTTP) server that responds to HTTP requests, the first server stores a first content identified by a first content identifier, and for use with a second server, the method by the first client device comprising:

receiving, from the second server, the first content identifier;

sending, to the first server over the Internet, a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier;

receiving, the first content from the first server over the Internet in response to the sending of the first content identifier; and

sending, the first content by the first client device to the second server, in response to the receiving of the first content identifier.

36.     As described in the above paragraphs, upon information and belief, the Accused Services comprise numerous proxy client devices each of which is a client device ("first client device") and a server of the Accused Services ("second server"). An HTTP web server that responds to HTTP requests ("first server") stores content ("first content") identified by an identifier ("first content identifier"), such as for example an HTTP web server storing a webpage identified by a URL address.  As described above, a first client device (a) receives a first content identifier from the second server of the Accused Services; (b) sends an HTTP request comprising the first content identifier to the first server; (c) receives the first content from the first server over the Internet in response to the sending of the first content identifier; and (d) sends the first content to the second server of the Accused Services in response to receiving the first content identifier.

37.     The '319 Patent includes a number of dependent claims.  In addition to practicing the steps of independent claim 1, upon information and belief as discussed above, NetNut and

others using NetNut's Accused Services also practice at least the steps of the following dependent claims:

Claim 17: The method according to claim 1, further comprising periodically communicating between the second server and the first client device.

Claim 24: The method according to claim 1, further comprising establishing, by the first client device, a Transmission Control Protocol (TCP) connection with the second server using TCP/IP protocol.

Claim 25: The method according to claim 1, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server, wherein the first client device communicates over the Internet with the first or second server based on, or according to, using TCP/IP protocol or connection.

Claim 27: The method according to claim 1, wherein the steps are sequentially executed.

38.     NetNut has actual notice of the '319 Patent since before it developed and released the Accused Services and knows at least from this Complaint, in addition to the means set forth above, that implementation of the Accused Services using residential proxy devices in the United States would infringe at least claims 1, 17, 24, 25, and 27 of the '319 Patent.

39.     Upon information and belief NetNut sold, offered to sell, used, tested, and imported and continue to sell, offer to sell, use, test, and import the Accused Services into the United States. NetNut provides the rotating residential proxy service of the Accused Services to their customers with the knowledge and intent that the customers' implementation of the service using residential proxies located in the U.S. would infringe the '319 Patent.

40.     NetNut has been and is now infringing at least directly, indirectly and/or contributorily, one or more claims including at least claims 1, 17, 24, 25 and 27 of the '319 Patent,

both literally and/or under the doctrine of equivalents, by implementing the Accused Services using residential proxy devices located in the United States without authority and/or license from Bright Data and are liable to Bright Data under 35 U.S.C. § 271 et seq., including but not limited to under Sections 271(a), (b), (c) and/or (g). On information and belief, NetNut has been aware of the Asserted Patents prior to the development and release of the Accused Services yet has continued to infringe and cause proxies in the United States under NetNut's control to infringe claims of the Asserted Patents and has induced infringement. On further information and belief, NetNut has developed, used, offered to sell and/or sold within the United States and imported into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use. On further information and belief, NetNut also imports and sells as well as causes others to use within the United States a product which is made by a process patented in the United States whereby the importation, offer to sell, sale, and/or use of the product occurs during the term of such process patent. Such products may include for example, the set of results sent to customers in the United States as created and assembled by the patented methods of the Asserted Patents.

41. As a result of NetNut's infringement of the '319 Patent, Bright Data has suffered and continues to suffer damages. Thus, Bright Data is entitled to recover from NetNut the damages Bright Data sustained as a result of NetNut's wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court together with increased damages up to three times under 35 U.S.C. § 284.

42.     Bright Data has suffered damage because of the infringing activities of NetNut, its officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Bright Data will continue to suffer irreparable harm for which there is no adequate remedy at law unless NetNut's infringing activities are preliminarily and permanently enjoined by this Court.  Bright Data practices the Asserted Patents and, on information and belief, practicing the Asserted Patents is required for a competitive offering of residential proxy services, a technology and market that Bright Data created.  Non-exclusive examples of such damage include loss of market share, lowered prices and the inability of Bright Data to obtain the revenues and profits it would have been able to obtain but for the infringement, lost sales in other services when customers did not purchase residential proxy services from Bright Data as a result of the infringement, loss of convoyed sales of other related services that Bright Data would have sold but for the infringement, and harm to Bright Data's reputation as a result of NetNut's lower quality and less protected offerings damaging the reputation and perception of the residential proxy service market that relies on the technology of the Asserted Patents.

43.     Upon information and belief, NetNut's infringement of the '319 Patent is and continues to be deliberate and willful because NetNut was and is on notice of the '319 Patent before it developed and introduced the Accused Services in the United States, yet NetNut continues to infringe the '319 Patent.  This case should be deemed an exceptional case under 35 U.S.C. § 285, and if so, Bright Data is entitled to recover its attorneys' fees.

**COUNT II**
(Infringement of U.S. Patent No. 10,484,510 - the '510 Patent)

44.     Bright Data repeats and re-alleges the allegations contained in paragraphs 1–43 of this First Amended Complaint as if fully set forth herein.

45.     The '510 Patent entitled "System Providing Faster and More Efficient Data Communication" was duly and legally issued by the U.S. Patent and Trademark Office on November 19, 2019, from Application No. 16/278,107 filed on February 17, 2019, a continuation of Application No. 15/957,945, now Pat. No. 10,257,319, which is a continuation of application No. 14/025,109, now Pat. No. 10,069,936, which is a divisional of application No. 12/836,059, now Pat. No. 8,560,604, all of which claim priority to provisional application 61/249,624 filed on October 8, 2009. A true and accurate copy of the '510 Patent is attached hereto as Exhibit B.

46.     This Court previously found Claim 13 of the '510 Patent indefinite, though the determination is subject to appellate review.  Otherwise, each and every claim of the '510 Patent is valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282.

47.     Bright Data is the sole owner of the '510 Patent and has rights to past damages.

48.     Claim 1 of the '510 Patent recites:

A method for use with a web server that responds to Hypertext Transfer Protocol (HTTP) requests and stores a first content identified by a first content identifier, the method by a first client device comprising:

establishing a Transmission Control Protocol (TCP) connection with a second server;

sending, to the web server over an Internet, the first content identifier;

receiving, the first content from the web server over the Internet in response to the sending of the first content identifier; and

sending the received first content, to the second server over the established TCP connection, in response to the receiving of the first content identifier.

49.     As described in the above paragraphs, upon information and belief, the Accused Services comprise numerous proxy devices each of which is a client device ("first client device") and a server of the Accused Services ("second server").  A web server that responds to HTTP

requests ("web server") stores content ("first content") identified by an identifier ("first content identifier"), such as for example an HTTP web server storing a webpage identified by a URL address. As described above, a first client device (a) establishes a TCP connection with a second server; (b) sends the first content identifier to the web server; (c) receives the first content from the web server over the Internet in response to the sending of the first content identifier; and (d) sends the received first content to the second server of the Accused Services over the established TCP connection in response to the receiving of the first content identifier.

50.     The '510 Patent includes a number of dependent claims. In addition to practicing the steps of independent claim 1, upon information and belief as discussed above, NetNut and others using NetNut's Accused Services mentalities also practice at least the steps of the following dependent claims:

Claim 8: The method according to claim 1, further comprising periodically communicating over the TCP connection between the second server and the first client device.

Claim 15: The method according to claim 1, further comprising receiving, by the first client device from the second server over the established TCP connection, the first content identifier.

Claim 16: The method according to claim 1, wherein the sending of the first content identifier to the web server over the Internet comprises sending a Hypertext Transfer Protocol (HTTP) request that comprises the first content identifier.

Claim 18: The method according to claim 1, wherein the second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server that communicates over the Internet based on, or according to, using TCP/IP protocol or connection, and wherein the first client device is a Transmission Control Protocol/Internet Protocol (TCP/IP) client that

communicates with the second server over the Internet based on, or according to, TCP/IP protocol.

Claim 20: The method according to claim 1, wherein the first content comprises web-page, audio, or video content, and wherein the first content identifier comprises a Uniform Resource Locator (URL).

Claim 22: The method according to claim 1, further comprising storing, operating, or using, a client operating system.

Claim 23: The method according to claim 1, wherein the steps are sequentially executed.

51.     Upon information and belief, NetNut has had actual notice of the '510 Patent since before it developed and released the Accused Instrumentalities and knows at least from the Complaint that implementation of the Accused Instrumentalities using residential proxy devices in the United States would infringe at least claims 1, 8, 15, 16, 18, 20, 22 and 23 of the '510 Patent.

52.     Upon information and belief NetNut sold, offered to sell, used, tested, and imported and continue to sell, offer to sell, use, test, and import the Accused Instrumentalities into the United States. NetNut provides the residential service of the Accused Instrumentalities to their customers with the knowledge and intent that the customers' implementation of the service using residential proxies located in the U.S. would infringe the '510 Patent.

53.     NetNut has been and is now infringing at least directly, indirectly and/or contributorily, one or more claims including at least claims 1, 8, 15, 16, 18, 20, 22 and 23 of the '510 Patent, both literally and/or under the doctrine of equivalents, by implementing the Accused Instrumentalities using residential proxy devices located in the United States without authority and/or license from Bright Data and are liable to Bright Data under 35 U.S.C. § 271 et seq., including but not limited to under Sections 271(a), (b), (c) and/or (g). On information and belief,

NetNut has been aware of the Asserted Patents since before the development and release of the Accused Instrumentalities in the United States yet has continued to infringe and cause proxies in the United States under NetNut's control to infringe claims of the Asserted Patents and has induced infringement. On further information and belief, NetNut has developed, used, offered to sell and/or sold within the United States and imported into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use. On further information and belief, NetNut also imports and sells as well as causes others to use within the United States a product which is made by a process patented in the United States whereby the importation, offer to sell, sale, and/or use of the product occurs during the term of such process patent. Such products may include for example, the set of results sent to customers in the United States as created and assembled by the patented methods of the Asserted Patents.

54. As a result of NetNut's infringement of the '510 Patent, Bright Data has suffered and continues to suffer damages. Thus, Bright Data is entitled to recover from NetNut the damages Bright Data sustained as a result of NetNut's wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court together with increased damages up to three times under 35 U.S.C. § 284.

55. Bright Data has suffered damage because of the infringing activities of NetNut, its officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Bright Data will continue to suffer irreparable harm for which there is no adequate remedy at law unless NetNut's infringing activities are preliminarily

and permanently enjoined by this Court. Bright Data practices the Asserted Patents and, on information and belief, practicing the Asserted Patents is required for a competitive offering of residential proxy services, a technology and market that Bright Data created. Non-exclusive examples of such damage include loss of market share, lowered prices and the inability of Bright Data to obtain the revenues and profits it would have been able to obtain but for the infringement, lost sales in other services when customers did not purchase residential proxy services from Bright Data as a result of the infringement, loss of convoyed sales of other related services that Bright Data would have sold but for the infringement, and harm to Bright Data's reputation as a result of NetNut's lower quality and less protected offerings damaging the reputation and perception of the residential proxy service market that relies on the technology of the Asserted Patents.

56. NetNut's infringement of the '510 Patent is and continues to be deliberate and willful because NetNut was and is on notice of the '510 Patent at least as early as the Complaint, yet NetNut continues to infringe the '510 Patent. This case should be deemed an exceptional case under 35 U.S.C. § 285, and if so, Bright Data is entitled to recover its attorneys' fees.

**COUNT III**
(Infringement of U.S. Patent Nos. 10,491,713 - the '713 Patent)

57. Bright Data repeats and re-alleges the allegations contained in paragraphs 1–56 of this Amended Complaint as if fully set forth herein.

58. The '713 Patent entitled "System Providing Faster and More Efficient Data Communication" was duly and legally issued by the U.S. Patent and Trademark Office on November 26, 2019, from Application No. 16/396,695 filed on April 28, 2019, which is a continuation of application No. 15/957,942, now Pat. No. 10,313,484, which is a continuation of application No. 14/025,109, now Pat. No. 10,069,936, which is a division of application No. 12/836,059, now Pat. No. 8,560,604, all of which claim priority to provisional application

61/249,624 filed on October 8, 2009. A true and accurate copy of the '713 Patent is attached hereto as Exhibit C.

59. Each and every claim of the '713 Patent is valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282.

60. Bright Data is the sole owner of the '713 Patent and has rights to past damages.

61. Claim 1 of the '713 Patent recites:

A method for use with a requesting client device that comprises an HTTP client and is identified over the Internet by a first Internet Protocol (IP) address, for use with a first server that is a web server that is Hypertext Transfer Protocol (HTTP) or Hypertext Transfer Protocol Secure (HTTPS) server that respectively responds to HTTP or HTTPS requests and stores a first content identified by a first content identifier, for use with a second server distinct from the first web server and identified in the Internet by a second IP address, the method by the requesting client device comprising:

identifying, an HTTP or HTTPS request for the first content

sending, to the second server using the second IP address over the Internet in response to the identifying, the first content identifier and a geographical location; and

receiving, over the Internet in response to the sending, from the second server via a first client device, the part of, or the whole of, the first content.

62. As described in the above paragraphs, upon information and belief, the Accused Services comprise customers using a client device ("requesting client device") with a first IP address; an HTTP or HTTPS web server that responds to HTTP/HTTPs requests ("first server") that stores content ("first content") identified by an identifier ("first content identifier"), such as for example an HTTP/HTTPS web server storing a webpage; a server of the Accused Services identified by a second IP address ("second server"); and numerous proxy client devices each of which is a client device "first client device"). As described above, a requesting client device (a) identifies an HTTP or HTTPS request for the first content; (b) sends to the second server using the second IP address over the Internet the first content identifier and a geographic location; (c)

receives over the Internet the part of or whole of the first content from the second server via a first client device.

63.    The '713 Patent includes a number of dependent claims.  In addition to practicing the steps of independent claim 1, upon information and belief as discussed above, NetNut and others using NetNut's Accused Services mentalities also practice at least the steps of the following dependent claims:

Claim 11: The method according to claim 1, further comprising periodically communicating between the second server and the requesting client device.

Claim 24:  The method according to claim 1, further comprising establishing, by the requesting client device, a Transmission Control Protocol (TCP) connection with the second server or with the first client device using TCP/IP protocol.

Claim 27:  The method according to claim 1, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server and communicates over the Internet with the requesting client device based on, or according to, using TCP/IP protocol or connection.

64.    NetNut has actual notice of the '713 Patent since before it developed and released the Accused Services and knows at least from this First Amended Complaint, in addition to the means set forth above, that implementation of the Accused Services using residential proxy devices in the United States would infringe at least claim 1 of the '713 Patent.

65.    Upon information and belief NetNut sold, offered to sell, used, tested, and imported and continue to sell, offer to sell, use, test, and import the Accused Services into the United States. NetNut provides the rotating residential proxy service of the Accused Services to their customers

with the knowledge and intent that the customers' implementation of the service using residential proxies located in the U.S. would infringe the '713 Patent.

66.     NetNut has been and is now infringing at least directly, indirectly and/or contributorily, one or more claims including at least claim 1 of the '713 Patent, both literally and/or under the doctrine of equivalents, by implementing the Accused Services using residential proxy devices located in the United States without authority and/or license from Bright Data and are liable to Bright Data under 35 U.S.C. § 271 et seq., including but not limited to under Sections 271(a), (b), (c) and/or (g).  On information and belief, NetNut has been aware of at least some of the Asserted Patents prior to the development and release of the Accused Services and of the '713 Patent at least as of the filing of this First Amended Complaint yet has continued to infringe and cause proxies in the United States under NetNut's control to infringe claims of the Asserted Patents and has induced infringement.  On further information and belief, NetNut has developed, used, offered to sell and/or sold within the United States and imported into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.  On further information and belief, NetNut also imports and sells as well as causes others to use within the United States a product which is made by a process patented in the United States whereby the importation, offer to sell, sale, and/or use of the product occurs during the term of such process patent.  Such products may include for example, the set of results sent to customers in the United States as created and assembled by the patented methods of the Asserted Patents.

67.     As a result of NetNut's infringement of the '713 Patent, Bright Data has suffered and continues to suffer damages.  Thus, Bright Data is entitled to recover from NetNut the damages Bright Data sustained as a result of NetNut's wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court together with increased damages up to three times under 35 U.S.C. § 284.

68.     Bright Data has suffered damage because of the infringing activities of NetNut, its officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Bright Data will continue to suffer irreparable harm for which there is no adequate remedy at law unless NetNut's infringing activities are preliminarily and permanently enjoined by this Court.  Bright Data practices the Asserted Patents and, on information and belief, practicing the Asserted Patents is required for a competitive offering of residential proxy services, a technology and market that Bright Data created.  Non-exclusive examples of such damage include loss of market share, lowered prices and the inability of Bright Data to obtain the revenues and profits it would have been able to obtain but for the infringement, lost sales in other services when customers did not purchase residential proxy services from Bright Data as a result of the infringement, loss of convoyed sales of other related services that Bright Data would have sold but for the infringement, and harm to Bright Data's reputation as a result of NetNut's lower quality and less protected offerings damaging the reputation and perception of the residential proxy service market that relies on the technology of the Asserted Patents.

69.     Upon information and belief, NetNut's infringement of the '713 Patent is and continues to be deliberate and willful because NetNut was and is on notice of the '713 Patent at least as of this First Amended Complaint, yet NetNut continues to infringe the '713 Patent.  This

case should be deemed an exceptional case under 35 U.S.C. § 285, and if so, Bright Data is entitled to recover its attorneys' fees.

### COUNT IV
(Infringement of U.S. Patent No. 11,050,852 - the '852 Patent)

70.     Bright Data repeats and re-alleges the allegations contained in paragraphs 1–69 of this Amended Complaint as if fully set forth herein.

71.     The '852 Patent entitled "System Providing Faster and More Efficient Data Communication" was duly and legally issued by the U.S. Patent and Trademark Office on June 29, 2021, from Application No. 16/600,506 filed on October 13, 2019, which is a continuation of application No. 16/396,695, now Pat. No. 10,491,713, which is a continuation of application No. 15/957,942, now Pat. No. 10,313,484, which is a continuation of application No. 14/025,109, now Pat. No. 10,069,936, which is a division of application No. 12/836,059, now Pat. No. 8,560,604, all of which claim priority to provisional application 61/249,624 filed on October 8, 2009.  A true and accurate copy of the '852 Patent is attached hereto as Exhibit D.

72.     Each and every claim of the '852 Patent is valid and enforceable, and each enjoys a statutory presumption of validity under 35 U.S.C. § 282.

73.     Bright Data is the sole owner of the '852 Patent and has rights to past damages.

74.     Claim 1 of the '852 Patent recites:

A method by a requesting client device that is identified over the Internet by a first Internet Protocol ( IP ) address, for use with a first server that is a web server that is Hypertext Transfer Protocol (HTTP) or Hypertext Transfer Protocol Secure (HTTPS) server that respectively responds to HTTP or HTTPS requests and stores a first content identified by a first Uniform Resource Locator (URL), and for use with a second server distinct from the first web server and identified in the Internet by a second IP address, the method by the requesting client device comprising:

generating an HTTP or HTTPS request that comprises the first URL and a geographical location;

sending, to the second server using the second IP address over the Internet, the generated HTTP or HTTPS; and

receiving, over the Internet in response to the sending, from the second server via a first client device, part of, or whole of, the first content,

wherein the first content comprises a web-page, an audio content, or a video content.

75.     As described in the above paragraphs, upon information and belief, the Accused Services comprise customers using a client device ("requesting client device") with a first IP address; an HTTP or HTTPS web server that responds to HTTP/HTTPs requests ("first server") that stores content ("first content") identified by an identifier ("first content identifier"), such as for example an HTTP/HTTPS web server storing a webpage identified by a URL; a server of the Accused Services identified by a second IP address ("second server"); and numerous proxy client devices each of which is a client device ("first client device"). As described above, a requesting client device (a) generates an HTTP or HTTPS request that comprises the first URL and a geographic location; (b) sends to the second server using the second IP address over the Internet the generated HTTP/HTTPS request; (c) receives over the Internet the part of or whole of the first content from the second server via a first client device; and (d) the first content comprises a web-page, audio content, or video content.

76.     The '852 Patent includes a number of dependent claims. In addition to practicing the steps of independent claim 1, upon information and belief as discussed above, NetNut and others using NetNut's Accused Services mentalities also practice at least the steps of the following dependent claims:

Claim 14: The method according to claim 1, further comprising periodically communicating between the second server and the requesting client device.

Claim 25: The method according to claim 1, further comprising establishing, by the requesting client device, a Transmission Control Protocol (TCP) connection with the second server or with the first client device using TCP/IP protocol.

Claim 28: The method according to claim 1, wherein the first or second server is a Transmission Control Protocol/Internet Protocol (TCP/IP) server and communicates over the Internet with the requesting client device based on, or according to, using TCP/IP protocol or connection.

77. NetNut has actual notice of the '852 Patent since at least the filing of this First Amended Complaint and knows at least from this First Amended Complaint, in addition to the means set forth above, that implementation of the Accused Services using residential proxy devices in the United States would infringe at least claim 1 of the '852 Patent.

78. Upon information and belief NetNut sold, offered to sell, used, tested, and imported and continue to sell, offer to sell, use, test, and import the Accused Services into the United States. NetNut provides the rotating residential proxy service of the Accused Services to their customers with the knowledge and intent that the customers' implementation of the service using residential proxies located in the U.S. would infringe the '852 Patent.

79. NetNut has been and is now infringing at least directly, indirectly and/or contributorily, one or more claims including at least claim 1 of the '852 Patent, both literally and/or under the doctrine of equivalents, by implementing the Accused Services using residential proxy devices located in the United States without authority and/or license from Bright Data and are liable to Bright Data under 35 U.S.C. § 271 et seq., including but not limited to under Sections 271(a), (b), (c) and/or (g). On information and belief, NetNut has been aware of at least some of the Asserted Patents prior to the development and release of the Accused Services and this patent

at least as of the filing of the First Amended Complaint, yet has continued to infringe and cause proxies in the United States under NetNut's control to infringe claims of the Asserted Patents and has induced infringement. On further information and belief, NetNut has developed, used, offered to sell and/or sold within the United States and imported into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use. On further information and belief, NetNut also imports and sells as well as causes others to use within the United States a product which is made by a process patented in the United States whereby the importation, offer to sell, sale, and/or use of the product occurs during the term of such process patent. Such products may include for example, the set of results sent to customers in the United States as created and assembled by the patented methods of the Asserted Patents.

80. As a result of NetNut's infringement of the '852 Patent, Bright Data has suffered and continues to suffer damages. Thus, Bright Data is entitled to recover from NetNut the damages Bright Data sustained as a result of NetNut's wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court together with increased damages up to three times under 35 U.S.C. § 284.

81. Bright Data has suffered damage because of the infringing activities of NetNut, its officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Bright Data will continue to suffer irreparable harm for which there is no adequate remedy at law unless NetNut's infringing activities are preliminarily and permanently enjoined by this Court. Bright Data practices the Asserted Patents and, on

information and belief, practicing the Asserted Patents is required for a competitive offering of residential proxy services, a technology and market that Bright Data created. Non-exclusive examples of such damage include loss of market share, lowered prices and the inability of Bright Data to obtain the revenues and profits it would have been able to obtain but for the infringement, lost sales in other services when customers did not purchase residential proxy services from Bright Data as a result of the infringement, loss of convoyed sales of other related services that Bright Data would have sold but for the infringement, and harm to Bright Data's reputation as a result of NetNut's lower quality and less protected offerings damaging the reputation and perception of the residential proxy service market that relies on the technology of the Asserted Patents.

82. Upon information and belief, NetNut's infringement of the '852 Patent is and continues to be deliberate and willful because NetNut was and is on notice of the '852 Patent before it developed and introduced the Accused Services in the United States, yet NetNut continues to infringe the '852 Patent. This case should be deemed an exceptional case under 35 U.S.C. § 285, and if so, Bright Data is entitled to recover its attorneys' fees.

### COUNT V
(Infringement of U.S. Patent No. 11,044,346 - the '346 Patent)

83. Bright Data repeats and re-alleges the allegations contained in paragraphs 1–82 of this Amended Complaint as if fully set forth herein.

84. The '346 Patent entitled "System Providing Faster and More Efficient Data Communication" was duly and legally issued by the U.S. Patent and Trademark Office on June 22, 2021, from Application No. 17/146,701 filed on January 12, 2021, 2019, which is a continuation of application No. 17/019,268, now Pat. No. 10,931,792, which is a continuation of application No. 16/910,863, now Pat. No. 10,805,429, which is a continuation of application No. 16/600,504, which is a continuation of application No. 16/278,105, now Pat. No. 10,469,628,

which is a continuation of application No. 15/957,950, now Pat. No. 10,225,374, which is a

continuation of application No. 14 /025,109, now Pat . No. 10,069,936, which is a division of

application No. 12/836,059, now Pat. No. 8,560,604, all of which claim priority to provisional

application 61/249,624 filed on October 8, 2009.  A true and accurate copy of the '346 Patent is

attached hereto as Exhibit E.

85.     Each and every claim of the '346 Patent is valid and enforceable, and each enjoys

a statutory presumption of validity under 35 U.S.C. § 282.

86.     Bright Data is the sole owner of the '346 Patent and has rights to past damages.

87.     Claim 1 of the '346 Patent recites:

A method for fetching a content by a requesting client device from a web server, the content comprises multiple parts where each part is identified by a distinct Uniform Resource Locator (URL), for use with a first server that is configured for anonymously fetching the multiple parts from the web server using intermediate devices, the method by the requesting client device comprising:

executing an application;

identifying the multiple parts as part of executing the application

sending, to the first server over the Internet, a geographical location and HTTP or HTTPS requests for the URLs of the multiple parts and; and

receiving, over the Internet in response to the sending and the geographical location, from the first server, the content,

wherein each of the multiple parts consists of, or comprises, a web-page or a portion thereof.

88.     As described in the above paragraphs, upon information and belief, the Accused

Services comprise customers using a client device ("requesting client device") that fetches content

("first content") from a web server identified by a URL for use with a first server ("first server")

for anonymously fetching parts ("first content") from the web server using intermediate devices.

As described above, a requesting client device (a) executes an application; (b) identifies the

multiple parts that consist of a web-page or a portion of the web-page, as part of executing the application; (c) sends, to the first server over the Internet, a geographical location and HTTP or HTTPS requests for the URLs of the multiple parts; and (d) receives, in response to the sending the geographical location, the content of multiple parts over the Internet.

89.     Upon information and belief NetNut sold, offered to sell, used, tested, and imported and continue to sell, offer to sell, use, test, and import the Accused Services into the United States. NetNut provides the rotating residential proxy service of the Accused Services to their customers with the knowledge and intent that the customers' implementation of the service using residential proxies located in the U.S. would infringe the '346 Patent.

90.     NetNut has been and is now infringing at least directly, indirectly and/or contributorily, one or more claims including at least claim 1 of the '346 Patent, both literally and/or under the doctrine of equivalents, by implementing the Accused Services using residential proxy devices located in the United States without authority and/or license from Bright Data and are liable to Bright Data under 35 U.S.C. § 271 et seq., including but not limited to under Sections 271(a), (b), (c) and/or (g).  On information and belief, NetNut has been aware of some of the Asserted Patents prior to the development and release of the Accused Services and this patent at least as of the filing of this First Amended Complaint yet has continued to infringe and cause proxies in the United States under NetNut's control to infringe claims of the Asserted Patents and has induced infringement.  On further information and belief, NetNut has developed, used, offered to sell and/or sold within the United States and imported into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple

article or commodity of commerce suitable for substantial noninfringing use. On further information and belief, NetNut also imports and sells as well as causes others to use within the United States a product which is made by a process patented in the United States whereby the importation, offer to sell, sale, and/or use of the product occurs during the term of such process patent. Such products may include for example, the set of results sent to customers in the United States as created and assembled by the patented methods of the Asserted Patents.

91. As a result of NetNut's infringement of the '346 Patent, Bright Data has suffered and continues to suffer damages. Thus, Bright Data is entitled to recover from NetNut the damages Bright Data sustained as a result of NetNut's wrongful and infringing acts in an amount no less than its lost profits and/or a reasonable royalty, together with interest and costs fixed by this Court together with increased damages up to three times under 35 U.S.C. § 284.

92. Bright Data has suffered damage because of the infringing activities of NetNut, its officers, agents, servants, employees, associates, partners, and other persons who are in active concert or participation therewith, and Bright Data will continue to suffer irreparable harm for which there is no adequate remedy at law unless NetNut's infringing activities are preliminarily and permanently enjoined by this Court. Bright Data practices the Asserted Patents and, on information and belief, practicing the Asserted Patents is required for a competitive offering of residential proxy services, a technology and market that Bright Data created. Non-exclusive examples of such damage include loss of market share, lowered prices and the inability of Bright Data to obtain the revenues and profits it would have been able to obtain but for the infringement, lost sales in other services when customers did not purchase residential proxy services from Bright Data as a result of the infringement, loss of convoyed sales of other related services that Bright Data would have sold but for the infringement, and harm to Bright Data's reputation as a result of

NetNut's lower quality and less protected offerings damaging the reputation and perception of the residential proxy service market that relies on the technology of the Asserted Patents.

93. Upon information and belief, NetNut's infringement of the '346 Patent is and continues to be deliberate and willful because NetNut was and is on notice of the '346 Patent at least as of the filing of this First Amended Complaint, yet NetNut continues to infringe the '346 Patent. This case should be deemed an exceptional case under 35 U.S.C. § 285, and if so, Bright Data is entitled to recover its attorneys' fees.

## COUNT VI
### (False Advertising Under 15 U.S.C. § 1125(a) *et seq.*)

94. Bright Data repeats and re-alleges the allegations contained in paragraphs 1-93 of this Amended Complaint as if fully set forth herein.

95. In Counts I-V, Bright Data alleges that the Accused Services, including NetNut's Rotating Residential Proxy service, infringes claims of the Asserted Patents by implementing the Accused Services using rotating residential proxy devices located in the United States. In its recent Motion to Dismiss for Lack of Personal Jurisdiction (Dkt. No. 24), ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

96. In the alternative, if NetNut's statements ████████████████████████

████████████████████ are correct then NetNut has engaged in false advertising under 15 U.S.C. § 1125(a) by making false advertisements to the public at large, including Bright Data's customers. Through these false advertisements, Bright Data believes and thus avers that NetNut

has materially represented ████████████████████████████████████████████████
████████

      97.    Through its website, NetNut has falsely advertised the Accused Services to customers in the United States, including Bright Data customers and potential customers ████ ████████████████████████████, stating specifically that the Accused Services are "available in every country:"



https://netnut.io/rotating-residential-proxies/.   This advertisement is contrary to NetNut's statements in its filings in this Court (see ¶79) and the sworn statement of NetNut's CEO, Mr. Barak Avitbul stating ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████



*See* Ex. A to Dkt. No. 24 at ¶8.

98.     NetNut also falsely advertises its Accused Services for customers in the United States in additional locations on its website:



NetNut even falsely advertises the specific use of the Accused Services in the United States in the Google Chrome Store by falsely advertising its NetNut Extension for Rotating Residential Proxy services in the United States:[1]



99.     NetNut caused its false advertising to enter interstate commerce, including upon information and belief in the Eastern District of Texas. NetNut's false advertising has at been distributed through at least Internet communications and advertisements including, but not limited to, NetNut's website (netnut.io).

100.    Defendant's actions have deceived, or are likely to deceive, a substantial segment of Bright Data's customers who have purchased or would otherwise purchase Bright Data's residential proxy service.

101.    NetNut's actions have caused Bright Data injury to a commercial interest in at least sales to potential customers. Bright Data's commercial injuries are a direct result of NetNut's false statements to the public, including potential Bright Data customers.

102.    Bright Data is entitled to a judgment that NetNut has engaged in false advertising which is the direct cause of Bright Data's injuries to its commercial interests in its sales under 15 U.S.C. 1125(a), and damages pursuant to 15 U.S.C. § 1117.

43

103. This case is exceptional, particularly given the willful nature of NetNut's false advertising. Bright Data is entitled to an award of attorneys' fees as this case is exceptional under 15 U.S.C. § 1117(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Bright Data respectfully requests that this Court enter:

A. A judgment in favor of Bright Data that NetNut has and is infringing the Asserted Patents;

B. A judgment declaring NetNut's infringement to be willful;

C. A judgment declaring that this case is exceptional within the meaning of 35 U.S.C. § 285;

D. A permanent injunction enjoining NetNut, its officers, directors, agents, servants, employees, associates, partners, and other persons who are in active concert or participation with NetNut including the officers, directors, agents, servants, employees and associates of NetNut's partners, from infringing the Asserted Patents and/or such other equitable relief the Court determines is warranted in this case;

E. A judgment and order requiring the NetNut to pay to Bright Data its damages, enhanced damages, costs, expenses, prejudgment and post-judgment interest, and attorneys' fees, if applicable, for NetNut's infringement of the Asserted Patents as provided under 35 U.S.C. §284 and/or §285, and an accounting of ongoing post-judgment infringement;

F. A judgment in favor of Bright Data that NetNut has engaged in false advertising against the public including Bright Data, and order requiring NetNut to pay monetary relief to Bright Data including (i) profits received by NetNut and/or damages sustained by

Bright Data as a result of NetNut's false advertising and (ii) damages in the form of money to be spent on corrective advertising, to dispel any actual confusion that may have already occurred among relevant consumers and in the marketplace by virtue of NetNut's false advertising;

G. That NetNut be found to have acted willfully in its false advertising, and that monetary relief for NetNut's false advertising be increased due to the willful nature of NetNut's false advertising pursuant to 15 U.S.C. § 1117;

H. A permanent injunction enjoining NetNut, their officers, employees, agents, representatives, attorneys and others acting on its or their behalf, from committing further acts of false advertising described herein;

I. A declaration that this is an exceptional case within the meaning of 35 U.S.C. § 285 and/or other applicable laws, and that Bright Data is entitled to recover its reasonable attorney's fees and costs upon prevailing in this action;

J. Disgorgement of the amount by which NetNut have been unjustly enriched; and

K. Any and all other relief, at law or in equity that this Court deems just or proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Bright Data hereby demands a trial by jury of all issues so triable.


Dated: October 11, 2021                                 Respectfully submitted,

                                                        By: */s/ J. Michael Woods*


                                                        Elizabeth L. DeRieux
                                                        State Bar No. 05770585
                                                        Capshaw DeRieux, LLP

114 E. Commerce Ave.
Gladewater, TX 75647
Telephone: 903-845-5770
ederieux@capshawlaw.com

J. Mark Mann
G. Blake Thompson
Mann | Tindel | Thompson
300 West Main
Henderson, TX 75652
mark@themannfirm.com
blake@themannfirm.com
Office 903-657-8540
Marshall Office 903-472-4294
Tyler Office 903-596-0900
Waco Office 254-776-3336

Korula T. Cherian
Robert Harkins
RuyakCherian LLP
1936 University Ave, Ste. 350
Berkeley, CA  94704
sunnyc@ruyakcherian.com
bobh@ruyakcherian.com

Thomas Dunham
Ronald Wielkopolski
J. Michael Woods
Colby A. Davis
RuyakCherian LLP
1901 L St. NW, Suite 700
Washington, DC 20036
tomd@ruyakcherian.com
ronw@ruyakcherian.com
michaelw@ruyakcherian.com
colbyd@ruyakcherian.com

*Attorneys for Plaintiff*
*Bright Data Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served this 11th day of October, 2021, with a copy of this document via electronic mail.

*/s/ J. Michael Woods*

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I hereby certify that the foregoing document is authorized to be filed under seal pursuant to the Unopposed Motion for Leave to File Under Seal being filed concurrently with this brief.

*/s/ J. Michael Woods*